**UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| JANE DOE<br>Plaintiff,<br><br>VS.<br><br>G6 HOSPITALITY, LLC,<br>G6 HOSPITALITY FRANCHISING, LLC,<br>G6 HOSPITALITY IP, LLC,<br>G6 HOSPITALITY PROPERTY, LLC,<br>G6 HOSPITALITY PURCHASING, LLC,<br>MOTEL 6 OPERATING, LP.,<br>DYNASTY HOTEL GROUP<br>ERIC R. HIRD<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. __________ |

**PLAINTIFF'S ORIGINAL COMPLAINT**

COMES NOW, Jane Doe Plaintiff in the above-styled and numbered cause, and files this Original Petition complaining of G6 HOSPITALITY, LLC, G6 HOSPITALITY FRANCHISING, LLC, G6 HOSPITALITY IP, LLC, G6 HOSPITALITY PROPERTY, LLC, G6 HOSPITALITY PURCHASING, LLC, and MOTEL 6 OPERATING, LP, and ERIC R. HIRD as Defendants, and respectfully shows the Court as follows:

## I. SUMMARY OF CASE

1. Sex trafficking is a widespread public health crisis that has reached epidemic levels in our communities, causing devastating harm to survivors and imposing a significant financial burden on society.

2. Estimates are that in 2016 there were as many as 40.3 million victims of human trafficking and sexual exploitation worldwide, including 4.8 million people trapped in sexual exploitation.[1]

3. The exploitation of victims of sex trafficking and prostitution most often does not occur solely at the hands of the traffickers and sex buyers. Rather, hotels often play an equal hand in the exploitation of these victims.

**The Role of the Hotel Industry and Defendant Hotels**

4. Defendants are aware of the important role that hotels play in the proliferation of sex trafficking and of the revenue they derive from sex trafficking that occurs at their hotels. Sex trafficking is prevalent in the United States, and hotels are the primary place where it happens.[2]

5. For years, sex traffickers have "been able to reap these profits with little risk when attempting to operate within hotels."[3] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[4] The Hotel Industry and Defendants knowingly facilitate and benefit financially and otherwise from sex trafficking at their locations and the specific locations complained of herein.

---

[1] Polaris Project, Human Trafficking Statistics, HUMAN TRAFFICKING SEARCH, https://humantraffickingsearch.org/resource/polaris-project-human-trafficking-statistics/ (last visited Mar. 28, 2025).
[2] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://finance.yahoo.com/news/human-trafficking-epidemic-u-apos-134529629.html citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id*.
[3] *See* Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic, Huffington Post, June 2016, at http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victims-life_us_57714091e4b0f168323a1ed7.
[4] Michele Sarkisian, Adopting the Code: Human Trafficking & the Hospitality Industry, HUMAN TRAFFICKING SEARCH, https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf (May 2019).

6. To address the crisis of sex trafficking at hotels, multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.

7. In 2016 the Texas Attorney General formed the Human Trafficking and Transnational/Organized Crime Division, tasked with combating human trafficking across Texas.

8. Some of the policies and procedures recommended to the Hotel Industry and Defendants designed to reduce or eliminate sex trafficking on their premises include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[7]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness; Individuals show signs of physical abuse, restraint, and/or confinement; Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;
- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior; Individuals lack freedom of movement or are constantly monitored;
- Individuals avoid eye contact and interaction with others; Individuals have no control over or possession of money or ID; Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;
- Individuals have few or no personal items—such as no luggage or other bags; Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;
- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker; Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana; Possession of bulk sexual paraphernalia such as condoms or lubricant;
- Possession or use of multiple cell phones; and Possession or use of large amounts of cash or pre-paid cards.

9. Jane Doe was trafficked at a hotel owned and operated by Defendants while exhibiting signs and behaviors consistent with these recommendations in the presence of Defendants' employees and agents.

10. The Trafficking Victims Reauthorization Protection Act (TVPRA) has provided civil remedies at the federal level since 2003 by "allow[ing] trafficking victims to sue their traffickers for money damages in federal court."[5] In 2008, Congress amended the TVPRA to expand its scope through creation of "beneficiary" liability, providing sex-trafficking victims with a cause of action to sue defendants who—though not criminally liable under the TVPRA—benefited from "participation in a venture which that person knew or should have known" was engaged in criminal sex trafficking.[6]

11. Texas has followed the Federal Government's lead in recognizing that actors other than actual traffickers and Johns, were participating in, promoting, facilitating, and benefitting

---

[5] Kathleen Kim & Kusia Hreshchyshyn, Human Trafficking Private Right of Action: Civil Rights for Trafficked Persons in the United States, 16 HASTINGS WOMEN'S L.J. 1 (2004) https://repository.uclawsf.edu/cgi/viewcontent.cgi?article=1288&context=hwlj.

[6] TVPRA 2008: William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110 457, 122 Stat. 5044.

from the selling of sex and sex trafficking through the enactment of Tex. Civ. Prac. & Rem. Code Ann. § 98.002.

12. To hold traffickers and the facilitators and promoters of prostitution responsible, the Texas legislature enacted Tex. Civ. Prac. & Rem. Code Ann. § 98.002, a provision that allows Jane Doe to bring claims against all who participated, promoted, facilitated, or benefitted from her trafficking. It expands the list of entities that can be held liable for human trafficking beyond those potentially criminally liable under Tex. Penal Code Ann. § 20A.02. For example, possible third parties include motel owners, hotels, doctors, labor recruiters, and others. In 2020, 48% of the defendants in civil sex trafficking suits were hotels.[7]

13. By allowing victims to file suits against third parties, Tex. Civ. Prac. & Rem. Code Ann. § 98.002 aims to deter businesses, like hotels, from knowingly or inadvertently being involved in trafficking rings. Tex. Civ. Prac. & Rem. Code Ann. § 98.002 seeks to hold those who engage in and those who benefit from prostitution and sex trafficking accountable to the resulting victims. Tex. Civ. Prac. & Rem. Code Ann. § 98.002 focuses on the "trafficking of persons" and is a cause of action that focuses on conduct that constitutes an underlying criminal offense. Tex. Civ. Prac. & Rem. Code Ann. § 98.002 mirrors the TVPA's provision (the federal human trafficking statute), so that an identical statute can apply in state courts for actors who would not be subject to federal jurisdiction. Tex. Civ. Prac. & Rem. Code Ann. § 98.002 should be liberally construed and applied to promote the underlying purpose to protect persons from human trafficking/compelled prostitution and provide adequate remedies to victims of human

[7] Kyleigh Feehs & Alyssa Currier Wheeler, 2020 Federal Human Trafficking Report, HUMAN TRAFFICKING INST., at 55 (2021), https://traffickinginstitute.org/wp-content/uploads/2022/01/2020-Federal-Human-Trafficking-Report-Low-Res.pdf.

trafficking/compelled prostitution.[8] The criminal justice system has long shouldered the burden of combating sex trafficking and the sale of sex by prosecuting traffickers, promoters of prostitution, and sex buyers. The civil justice system must also step in to hold those who profit from this industry accountable for their wrongful actions. Overall, Tex. Civ. Prac. & Rem. Code Ann. § 98.002 is an important step forward in the broader fight against human trafficking; it provides survivors an opportunity to finally secure a remedy for the harms inflicted on them.[9] For these reasons, and with great strength and courage, Jane Doe brings suit under Tex. Civ. Prac. & Rem. Code Ann. § 98.002, TVPRA under 22 U.S.C. § 7102, and related causes of action.

## II. PARTIES

### A. PLAINTIFF

14. Plaintiff Jane Doe was at all relevant times a trafficked person as that term is defined in Tex. Penal Code Ann. § 20A.02(3), Tex. Civ. Prac. & Rem. Code Ann. § 98.002 and TVPRA 22 U.S.C. § 7102. Jane Doe is a resident of Baldwin County, Alabama. Given the nature of these allegations, this complaint identifies the plaintiff as "Jane Doe" throughout. She may be contacted through her lead counsel, whose information is contained below.

15. There is a collective and compelling interest in keeping Jane Doe's identity anonymous.

### B. THE HOTEL DEFENDANTS G6 HOSPITALITY LLC

16. G6 Hospitality LLC is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas.

---

[8] Tex. Civ. Prac. & Rem. Code Ann. § 98.006.
[9] Tex. Civ. Prac. & Rem. Code Ann. § 98.002.

17. All references to G6 Hospitality LLC include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of G6 Hospitality LLC now or at any time relevant to the claims herein.

18. Defendant G6 Hospitality LLC may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 4360 Dallas, TX 75201.

**G6 HOSPITALITYFRANCHISING, LLC**

19. G6 Hospitality Franchising, LLC is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas.

20. All references to G6 Hospitality Franchising, LLC include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of G6 Hospitality Franchising, LLC now or at any time relevant to the claims herein.

21. Defendant G6 Hospitality Franchising, LLC may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 4360 Dallas, TX 75201.

**G6 HOSPITALITY IP, LLC**

22. G6 Hospitality IP, LLC is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas.

23. All references to G6 Hospitality IP, LLC include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent

authority), employee, person, firm, or corporation acting on behalf of G6 Hospitality IP, LLC now or at any time relevant to the claims herein.

24. Defendant G6 Hospitality IP, LLC may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 4360 Dallas, TX 75201.

**G6 HOSPITALITYPROPERTY, LLC**

25. G6 Hospitality Property, LLC is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas.

26. All references to G6 Hospitality Property, LLC include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of G6 Hospitality Property, LLC now or at any time relevant to the claims herein.

27. Defendant G6 Hospitality Property, LLC may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 4360 Dallas, TX 75201.

**G6 HOSPITALITYPURCHASING, LLC**

28. G6 Hospitality Purchasing, LLC is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas.

29. All references to G6 Hospitality Purchasing, LLC include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of G6 Hospitality Purchasing, LLC now or at any time relevant to the claims herein.

30. Defendant G6 Hospitality Purchasing, LLC may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 4360 Dallas, TX 75201.

**MOTEL6 OPERATING LP**

31. Motel 6 Operating LP is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas.

32. All references to Motel 6 Operating LP include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Motel 6 Operating LP now or at any time relevant to the claims herein.

33. Defendant Motel 6 Operating LP may be served through its registered agent: Cogency Global Inc., 1601 Elm Street Suite 4360 Dallas, TX 75201.

**DYNASTY HOTEL GROUP, LP**

34. Dynasty Hotel Group, LP is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas. At all relevant times, Dynasty Hotel Group, LP was the franchisee and owner of the property located at 10326 Finnell St, Dallas, TX 75220, a Studio 6 hotel.

35. All references to Dynasty Hotel Group, LP include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Motel 6 Operating LP now or at any time relevant to the claims herein.

36. Defendant Dynasty Hotel Group, LP may be served through its registered agent: Nayeem Mohammed, 1508 Prairie Dr Carrollton, TX 75007.

**ERIC R. HIRD**

37. Eric R. Hird ("Hird") is sui juris and, at all relevant times, was a named beneficiary of the trust holding ownership of the property located at 10326 Finnell St, Dallas, TX 75220, a Studio 6 hotel. Upon information and belief, Hird derived financial benefit from the operations of the property during the period in which the events giving rise to this Complaint occurred.

## III. JURISDICTION AND VENUE

38. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000.00).

39. This is a civil action alleging, *inter alia*, violations of 18 U.S.C. § 1595.

40. Venue is proper in this district pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims asserted in this action, including Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

## IV. SEX TRAFFICKING UNDER FEDERAL LAW

41. Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

42. Pursuant to 18 U.S.C. § 1591(a), all who knowingly provide or obtain commercial sex that was provided or obtained through force, fraud, and coercion – or performed by a minor under the age of 18 – are guilty of sex trafficking. This includes, at a minimum, ***both*** the 'traffickers' who

recruit, harbor, transport, and provide individuals for forced commercial sex work ***and*** the 'johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex work.[10]Criminal liability under 18 U.S.C. § 1591(a)(2) also extends to all who knowingly participate in a venture knowing or in reckless disregard of the fact that the venture is engaged in unlawful sex trafficking.

43. Under 18 U.S.C. § 1595(1), a victim of unlawful sex trafficking has a civil cause of action against (1) any "perpetrator" who engaged in a criminal violation of 18 U.S.C. § 1591; or (2) any "beneficiary" who knowing received a benefit from participation in a venture that the person knew or should have known was engaged in sex trafficking.

## V. SEX TRAFFICKING UNDER TEXAS LAW

44. Tex. Penal Code Ann. § 20A.02, is the criminal statute pertaining to the "trafficking of persons." A person commits the offense of trafficking an individual when that person knowingly benefits financially or by receiving anything of value from the sexual servitude of another. *Id*.

45. Pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 98.002 an individual who is a victim of a violation of Tex. Penal Code Ann. § 20A.02(3), shall have a cause of action against any defendant of said violation and may recover actual damages, court costs, reasonable attorney's fees, and exemplary damages.

## VI. STATEMENT OF FACTS

46. Jane Doe was lured to Studio 6 located at 10326 Finnell St, Dallas, TX 75220 under the pretense of a job interview for a housekeeping position.

47. Upon arrival, she was coerced and trapped in a room by Malik, her trafficker, and another individual, who then used physical violence and threats to force her into sex trafficking. The

[10] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'johns,' or 'buyers' [and such nomenclature is used herein], under federal law ***both*** categories are 'traffickers.'

unknown male had a gun and threatened Jane Doe to kill her. They both threatened to hurt her or her family since they had her driver's license with her family's address if she did not do their bidding.

48. Over the course of her captivity, Shelby was trafficked multiple times at this location. Despite numerous and obvious signs of sex trafficking, including large quantities of condoms in the trash; ongoing stays paid for in cash or a pre-paid card on a day-to-day basis; and numerous men entering and exiting the same room at all hours; arriving with few possessions for extended stays; and the appearance, demeanor, and restricted movements of the Jane Doe and other victims.

49. Upon information and belief, Jane Doe's trafficker rented a specific room at Studio 6 by paying for them using cash and prepaid cards in an effort to avoid using his real name.

50. Staff at the Studio 6 had a reasonable opportunity to observe Jane Doe who was being sexually exploited daily.

51. The rooms rented to Jane Doe's trafficker had high foot traffic. When a new client entered the hotel room, Jane Doe's trafficker would leave the hotel room. For a period of six to eight months until April of 2015, there were times when Malik would force Jane Doe to have sex with up to eight (8) people in a day. Malik would always wait outside.

52. Jane Doe was sex trafficked up to two times a week, for approximately eight months at this Studio 6 location.

53. After approximately eight months, Jane Doe managed to escape when a bystander called law enforcement while she was being trafficked at another hotel alongside another female victim. The following day, she fled the state.

54. On the day of Jane Doe's escape, one of the johns who engaged in sexual acts with Jane Doe remained in the room longer than expected and expressed a desire to help her escape. As a

result of the delay, Malik attempted to forcibly break down the door. Law enforcement was called to the scene and removed Malik from the property, creating an opportunity for Jane Doe to flee. To this day, she continues to live in fear that her trafficker will find her and cause her harm or even take her life.

55. At all relevant times, G6 HOSPITALITY PROPERTY, LLC, owned and operated the Studio 6 hotel.

56. At all material times, G6 Hospitality, LLC d/b/a Motel 6, G6 Hospitality Franchising LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, Motel 6 Operating, LP, (hereinafter collectively referred to as "G6 Hospitality") participated directly in the operation and management of Studio 6 and exercised systematic control over this Studio 6 location (who are actual agents of G6) with respect to the operation of their respective hotels.

57. At all relevant times, G6 Hospitality Property LLC was the owner of Studio 6. Defendants jointly employ the employees of the Studio 6 and because they jointly exercise a high degree of control over the terms and conditions of their employment. Defendants have a high degree of unified operations at Studio 6 where Jane Doe was trafficked for money. Defendants share the common policies and practices complained of throughout this Complaint. Defendants are separately and jointly responsible for compliance with all applicable laws and jointly and severally liable for any damages caused by employees of Studio 6. Defendants had, at all relevant times, direct and systemic control over this facility, responsibility for its operations, and corporate knowledge of the events that occurred at Studio 6. Studio 6 is an alter ego, representatives, and/or agent of G6 Hospitality.

58. G6 Hospitality exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures at the Studio 6. G6 Hospitality retains and exercises control over aspects of the operation of the Studio 6 directly relevant to Plaintiff's complaint, including but not limited to: a central online reservation system, revenue management tools, loyalty programs, the hotel website, policies and procedures regarding hotel security, policies and procedures regarding identification requirements and payment method requirements, policies and procedures regarding response to signs of human trafficking, training of hotel staff, and requirements for hotel staff to report suspicions of criminal activity, were involved in day-to-day consulting on operational issues at hotel; access to surveillance systems; collected and monitored data that showed patterns consistent with trafficking; participated in internal investigations; and solicited and received customer feedback and complaints.

59. G6 Hospitality facilitated the trafficking through repeated renting of rooms and substantial oversight over the franchisees' hotel operations. Because of the reporting policy and G6 Hospitality's monitoring of the Studio 6 hotel, G6 knew or should have known of Jane Doe's trafficking.

## VII. ASSUMED OR COMMON NAME

60. Jane Doe brings this petition against each Defendant in their assumed or common name and expressly reserves the right under to substitute the true name of any Defendant if needed or in response to Court Order pursuant to Tex. R. Civ. P. 28. Moreover, Jane Doe expressly invokes the right to amend under the doctrine of misnomer if any Defendants have been properly served but were done so under the wrong legal name.

## VII. FACTS REGARDING THE HOTEL DEFENDANTS

### A. Human trafficking and sexual exploitation are a rampant, well-known problem in the hotel industry.

61. What Defendants knew or should have known about the sex trafficking that was occurring at the Studio 6 including the trafficking of Jane Doe, is shaped by the widely known and pervasive relationship between the hotel industry and sex trafficking.

62. 75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff." *See* The Polaris Project.[11]

63. As detailed herein, sex trafficking is widespread in the United States, particularly within the hotel industry, and the Defendant was aware that their hotels served as a primary venue for such activities.

64. Recognizing the unique vantage point that hotel owners and staff have to identify potential human trafficking victims on their properties, the major hotel chains, including franchisors, franchisees, and owner/operators, have told the public they have accepted the unique opportunity and responsibility to stop facilitating sex trafficking.

65. In order to meet that responsibility, major hotel chains, including Defendant, have adopted robust anti-human trafficking policies to train its employees to identify and properly respond to the "red flags" of sex trafficking. Each and every Defendant named herein had the opportunity and responsibility to adopt, implement, and enforce similar policies at Studio 6. Unfortunately for Jane Doe, such policies were either not in place or were not enforced.

---

[11] *Hotels and Motels Recommendations*, The Polaris Project, https://polarisproject.org/hotels-motels-recommendations/ (last visited March 28, 2025).

**The Hotel Industry's Role in Sex Trafficking**

66. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[12] For years, sex traffickers have "been able to reap these profits with little risk when attempting to operate within hotels."[13] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[14]

67. To address the crisis of sex trafficking at hotels, multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the Polaris Project, the Texas Human Trafficking Prevention Task Force, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking and have made hotel operators, including Defendants, aware of this information.[15]

68. Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, include learning to identify warning signs and indicators of sex trafficking, including but not limited [16]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;
- Individuals show signs of physical abuse, restraint, and/or confinement;

---

[12] This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere."

[13] *See* Human Trafficking and the Hotel Industry, Polaris Project, March 1, 2015, at https://polarisproject.org/resources/human-trafficking-and-the-hotel-industry/; *see also* Eleanor Goldberg, You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic, Huffington Post, June 2016, at https://www.huffpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victims-life_n_57714091e4b0f168323a1ed7.

[14] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL UNIV. SCH. OF HOTEL ADMIN. THE SCHOLARLY COMMONS, Oct. 2015, https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf.

[16] U.S. Dep't of Homeland Sec., *Blue Campaign – One Voice. One Mission. End Human Trafficking*, https://www.dhs.gov/blue-campaign (last visited Mar. 28, 2025).

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;
- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;
- Individuals lack freedom of movement or are constantly monitored;
- Individuals avoid eye contact and interaction with others;
- Individuals have no control over or possession of money or ID;
- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;
- Individuals have few or no personal items—such as no luggage or other bags;
- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;
- A group of girls appears to be traveling with an older female or male;
- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;
- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;
- Possession of bulk sexual paraphernalia such as condoms or lubricant;
- Possession or use of multiple cell phones; and
- Possession or use of large amounts of cash or pre-paid cards.

69. Recognizing the unique position that hotel owners and staff often hold in identifying potential human trafficking victims on their properties, several major hotel chains, including

franchisors, franchisees, and owner/operators, have publicly acknowledged their opportunity and responsibility to prevent facilitating sex trafficking. In order to meet that responsibility, several (if not most) major hotel chains have adopted robust anti-human trafficking policies to train its employees to identify and properly respond to the "red flags" of sex trafficking. Each Defendant named herein had the opportunity and responsibility to adopt, implement, and enforce similar policies at Studio 6. Unfortunately for Jane Doe, Defendants failed to do so.

**The Use of Studio 6 Branded Properties for Sex Trafficking is Prevalent**

70. G6 Hospitality LLC brand expanded its portfolio of locations in 2001 with the acquisition of 23 extended stay properties that were converted into Studio 6.[17] G6 Hospitality LLC brands include Motel 6, Studio 6, and Studio 6 suites.[18]

71. Numerous tragic stories highlight the deeply rooted and widespread role of G6 Hospitality LLC hotel brands as venues for sex trafficking across the United States for years.:

- In 2016 the City of Los Angeles settled a case against G6 for sex trafficking out of a Studio 6 hotel located in Los Angeles.
- In 2016, City Attorney of Los Angeles sued the owner of the Motel 6 chain Monday, alleging the hospitality company and its managers allow rampant drug, gang and prostitution activity at its Sylmar property. [19]

---

[17] Motel 6 and Iconic American Brand. https://g6hospitality.com/our-brands/#:~:text=The%20first%20Studio%206%20opened%20in%20El%20Paso%2C,converted%20into%20Studio%206%20with%20minimal%20capital%20investment.

[18] *Id*.

[19] City Attorney Sues Over "Rampant Drug, Gang and Prostitution" at Sylmar Motel 6 https://www.nbclosangeles.com/news/city-attorney-sues-over-rampant-drug-gang-and-prostitution-at-sylmar-motel-6/91399/

- In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten times per day.[20]
- In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[21]
- In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[22]
- From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[23]
- Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[24]
- The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[25]
- The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim,

---

[20] Amy Fine Collins, *Sex Trafficking of Americans: The Girls Next Door,* Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/sex-trafficking-201105.

[21] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[22] Mark Reiter, Two Toledoans Accused of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html

[23] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usao-ndil/pr/two-aspiring-rappers-charged-operating-sex-trafficking-ring-chicago-and-suburbs.

[24] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims.

[25] *FBI Investigates Human Trafficking At Madison Hotel,* WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

California.[26]

- From 2013 to 2019, a woman alleged she was trafficked at a Motel 6 and employees did nothing to stop it as it would cut into motel's profits.[27]
- Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[28]
- Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota.[29]
- In 2014, a woman escapes her traffickers after being trafficked at a Motel 6 in Monterey.[30]
- In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida.[31]

---

[26] *Suspects Busted in Anaheim Sex Ring,* ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

[27] Brett Clarkson, Motel Near Strip Should've Stopped Woman from Being Trafficked, Lawsuit Alleges, LAS VEGAS REVIEW-JOURNAL, Oct. 23, 2023, https://www.reviewjournal.com/crime/courts/motel-near-strip-shouldve-stopped-woman-from-being-trafficked-lawsuit-alleges-2926788/.

[28] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.

[29] Man, 25, Is Accused Of Trafficking Teens, Twin Cities Pioneer Press (Jun. 5, 2014), https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/.

[30] Felix Cortez & Amy Larson, Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel, KSBW, May 9, 2014,https://www.ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after-victim-escapes-motel/1054172

[31] David Goodhue, Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court, Miami Herald (Sept. 2, 2015), https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html.

- A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City, Nevada.[32]
- In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island.[33]
- A local law enforcement investigation resulted in the rescue of a fifteen (15) year old runaway in February 2015, from a Motel 6 near the Oakland, California airport where she was being sex trafficked.[34]
- In North Charleston, South Carolina, a seventeen (17) year old girl was rescued in March 2015 from a Motel 6 by special agents from the United States Department of Homeland Security. The girl was sold for sex, beaten, and starved by a sex trafficker.[35]
- Two men were arrested in March 2015 for sex trafficking a fifteen (15) year old girl at Motel 6 in Austin, Texas.[36]
- In March 2015, police arrested a man for sex trafficking a runaway seventeen (17) year old at a Motel 6 in Warwick, Rhode Island.[37]

---

[32] Las Vegas Man Charged With Human Trafficking In Rapid City, Argus Leader (Jan. 17, 2015), https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid22city/21922915/.

[33] Stephen Peterson, RI Man Gets Jail In Sex-Trafficking Case Involving Seekonk Motel (Oct. 28, 2016), https://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involving-seekonk-motel/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html.

[34] Emilie Raguso, Woman Charged In Berkeley Teen Sex Trafficking Case (Dec. 8, 2015), https://www.berkeleyside.com/2015/12/08/woman-charged-in-berkeley-teen-sex-trafficking-case.

[35] Melissa Boughton, Police Say Teen Starved, Beaten at North Charleston Hotel; Man Arrested in Sex-Trafficking Case (Mar.2, 2015), https://www.postandcourier.com/archives/police-say-teen-starved-beaten-at-north-charleston-motel-man-arrested-in-sex-trafficking-case/article_032153ee-fcb6-5333-9182-926a7f43dfbf.html.

[36] Lindsay Bramson, Local Teen Saved from Sex Slavery; Two Charged, KXAN Austin (Mar. 6, 2015), https://www.kxan.com/news/local/austin/local-teen-freed-from-sex-slavery-two-charged/1049580764.

[37] Rob Borkowski, Troopers Arrest MA Man for Sex Trafficking Runaway Girl at Motel 6, PATCH, Mar. 24, 2015, https://warwickpost.com/troopers-arrest-ma-man-for-sex-trafficking-runaway-girl-at-motel-6/.

- Over a fourteen (14) month period ending in approximately April 2015, at the same Motel 6 in Warwick, Rhode Island had seventy-five (75) arrests on its property for crimes including sex-trafficking.[38]
- In the summer of 2015, a woman was arrested at a Motel 6 in Great Falls, Montana where she was involved in sex trafficking a seventeen (17) year old girl.[39]
- A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[40]
- In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[41]
- In approximately July 2015, sex traffickers sold a fifteen (15) year old girl for sex at a Motel 6 in Pismo Beach, California.[42]

72. G6 Hospitality knew sex trafficking was occurring at its hotels through publicly available online review websites, which are regularly reviewed by companies such as G6 Hospitality:

---

[38] Sarah Kaplan, Crime-Ridden Motel 6 In R.I. Will Hand Over Guest List to Police, The Washington Post (Apr. 28, 2015), https://www.washingtonpost.com/news/morning-mix/wp/2015/04/28/crime-ridden-motel-6-in-r-i-will-hand-over-guest-list-to-police/.

[39] Andrea Fisher, Woman Caught Up in Human Trafficking Ring Pleads Guilty (Aug. 29, 2016), https://www.greatfallstribune.com/story/news/local/2016/08/29/woman-caught-human-trafficking-ring-pleadsguilty/89566374/.

[40] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, HeraldNet (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[41] Tuscaloosa Man Charged with Rape and Trafficking Mississippi Teen, NewsMississippi (Nov. 7, 28 2014), https://www.tuscaloosanews.com/story/news/2014/11/06/tuscaloosa-man-charged-with-rape-and-human-trafficking-of-mississippi-teen/29940888007/.

[42] Matt Fountain, Four Accused of Pimping Out 15-Year-Old Girl In SLO Will Stand Trial, SanLuisObispo.com (May 5, 2016), https://www.sanluisobispo.com/news/local/article75832962.html.

- Regarding an April 2013 stay at the Motel 6 in Sacramento, California, a customer wrote: "Caters to prostitutes and johns. If you're a prostitute or john you'll love this Motel 6… Don't bother calling Guest Reservations either, because they'll say they can't do anything…"[43]
- There are public online reviews by former patrons of the Motel 6 located in Maple Shade New Jersey which describe the following obvious red flags that illicit trafficking was occurring openly: "pimps in the parking lot," "drug dealers," and drug paraphernalia residue in rooms, and "prostitution."[44]

72 . This sampling of news stories and reviews establishes that G6 Hospitality knew (or at a minimum, certainly should have known):

a. The use of G6 branded hotels, including Studio 6, for sex trafficking and prostitution was not isolated to one location;

b. The use of G6 branded hotels, including Studio 6, for sex trafficking was not isolated to one specific geographic region and was a nationwide problem;

c. G6 branded hotels, including Studio 6, was involved with multiple law enforcement investigations involving sex trafficking;

d. Sex trafficking at G6 branded hotels, including Studio 6, inherently involved compelled prostitution; and [45]

---

[43] https://www.tripadvisor.com/ShowUserReviews-g32999-d243533-r158549801-Motel_6_Sacramento_SouthSacramento_California.html.

[44]https://www.tripadvisor.com/Hotel_Review-g46598-d244130-Reviews Motel_6_Maple_Shade_Township_NJ_Philadelphia_MT_Laurel-Maple_Shade_New_Jersey.html

[45] "Prostitution and sex trafficking are inextricably linked, and where prostitution is legalized or tolerated, there is a greater demand for human trafficking victims and nearly always an increase in the number of women and children trafficked into commercial sex slavery." H.R. REP. 115-572, 5, 2018 U.S.C.C.A.N. 73, 76.

e. G6 branded hotels, including Studio 6, failed to ensure adequate proper policies and procedures were in place and being followed to prevent sex trafficking.

**The Use of Studio 6 for Sex Trafficking Was Well Known**

73. Similar stories and reviews establish the nature and knowledge of the specific locations where Jane Doe was exploited as venues for sex trafficking.

74. Specifically, at Studio 6, online reviews depicted a location that was not in conformity with the human trafficking policies they purport to apply and enforce.

75. There was a review as recent as 2022, demonstrating a continuous pattern of sex trafficking for this Studio 6 location stating:

[…] But there was a lot of people arguing and prostitution going on. Witnessed several men going in and out of one female's room and her talking about services costing $1500. Another fight happened at three in the morning where one girl stated she was trying to teach her how to be a good hoe. I felt very unsafe here and ended up leaving. […] OK I just did not feel comfortable with my car being parked out there and you will witness drug deals and prostitution deals going on. Sorry for the bad review. But I would not recommend this place.[46]

76. Despite the rampant trafficking occurring at its hotels for over a decade, it was not until September 2018, that G6 Hospitality announced that "the company will introduce anti-human trafficking training to corporate, field and property team members. Additionally, the company developed its own training for all property team members to understand how

[46] Mechelle T., YELP (June 20, 2022), https://www.yelp.com/biz/studio-6-dallas (last visited March 28, 2025).

to effectively intervene and identify potential trafficking situations to protect each other, guests and the community." [47]

**Studio 6 Facilitated the Trafficking of Jane Doe**

77. Between 2014 and 2015, while Jane Doe was being trafficked, her trafficker, Malik, rented a specific room and paid for it using cash or prepaid cards. Other buyers regularly entered the hotel and interacted with staff upon arrival. During this time, Jane Doe encountered at least eight buyers daily for up to eight months, and was repeatedly sexually assaulted at the Studio 6.

78. Malik always rented the same room from Studio 6. He was a repeated customer and was known at this location. Malik had a continuous business relationship between Defendants as he was as regular.

79. Defendants participated in a common undertaking involving risk and/or profit that violated the TVPRA upon knowing that Defendants participated in a common undertaking involving risk and profit that violated the TVPRA upon knowing, or having reason to know, that trafficking was occurring on their properties. By continuing to rent rooms to traffickers despite clear signs of illegal activity, Defendants knowingly took on the risk of facilitating human trafficking. Their actions not only exposed victims like Jane Doe to further exploitation but also placed themselves in direct violation of the TVPRA. In accepting the profits from these rentals, Defendants knowingly chose to participate in this unlawful venture, understanding the risk of their involvement in trafficking activities and the harm

---

[47] G6 Hospitality, G6 Hospitality Announces Enhanced Team Member Safety Initiatives, PR NEWSWIRE (Mar. 28, 2025), https://www.prnewswire.com/news-releases/g6-hospitality-announces-enhanced-team-member-safety-initiatives-300708211.html.

it caused. This participation created a venue for trafficking and solidified their role in a venture that violated the TVPRA.

80. Upon information and belief, Defendants actively monitored criminal activity occurring at hotels operating under their brand, regularly reviewed and monitored customer reviews of their properties, and developed and implemented uniform policies and procedures to identify, prevent, and mitigate the risk of sex trafficking at their hotels, including the property where Jane Doe was trafficked.

81. Employees at these hotels were aware of her trafficking and, in accordance with corporate-wide policies, reported such activity directly to Defendants. These reports included indicators of trafficking, such as suspicious booking and reservation patterns, cash payments for multiple rooms at a time, and frequent visits from multiple men throughout the day.

82. Despite this knowledge, Defendant failed to take appropriate action to investigate, intervene, or report the illegal activity to authorities, thereby acquiescing to sex trafficking operations occurring at its hotel.

83. Defendant neglected its legal duty to ensure that its employees, management, and security personnel were properly trained to recognize and report indicators of sex trafficking. Despite having control over the training and supervision of its employees, Defendant failed to implement adequate training programs that would have empowered staff to detect, report, and prevent sex trafficking activities.

84. These complaints were provided to Defendant in various forms, including reports from hotel employees, online reviews from guests, and direct complaints to management.

Despite this knowledge, Defendant failed to take any meaningful action to address these issues, allowing the trafficking activities to persist.

85. Defendant’s repeated failure to investigate complaints and review evidence of sex trafficking occurring at its hotel constitutes willful blindness to the criminal activity. Defendant’s inaction in the face of overwhelming evidence that trafficking was occurring on its premises is equivalent to tacit participation in the trafficking operations. Defendant's failure to take remedial action despite the knowledge of prostitution and trafficking occurring within the hotel establishes its complicity in these activities.

86. Defendant benefited financially from the activities of sex traffickers, including increased revenue from high turnover of rooms and extended stays often associated with trafficking operations. Defendant had a vested economic interest in ignoring or tolerating these illegal activities, as evidenced by the hotel's unwillingness to take steps to prevent trafficking or to investigate complaints that could negatively impact its financial bottom line. The franchisor of the Defendant hotel was also aware of the ongoing sex trafficking activities at the hotel, as the franchisor controlled critical aspects of hotel operations, including employee training, policies, and quality control.

87. Despite being made aware of the complaints and criminal activities occurring at the hotel, the franchisor failed to take any remedial action or conduct a proper investigation into the hotel’s operations. The franchisor’s failure to intervene in response to these ongoing illegal activities contributed to the continuation of sex trafficking at the hotel.

**Jane Doe’s Trafficking at the Studio 6 Could Have Been Prevented**

88. During her trafficking, Jane Doe’s trafficker frequently and regularly used the Studio 6 locations because he knew that members of the staff looked the other way, despite the

obvious signs of sex trafficking associated with Jane Doe's trafficking at Studio 6. Despite this, Studio 6 staff continued providing a venue for Jane Doe's sexual exploitation.

89. Defendants actively contributed to Jane Doe's ongoing trafficking through acts and omissions that facilitated the work of her traffickers, including, but not limited to, adopting policies and procedures that allowed trafficking to flourish in G6 properties and failing to implement and enforce adequate anti-sex trafficking policies and training despite their actual knowledge they were profiting off sexual exploitation.

90. Defendants are responsible for the acts and omissions of the staff of the Studio 6 because these acts were committed in the scope and course of employment for Defendants.

91. Defendants are responsible for the acts and omissions of the Studio 6 staff because Defendants failed to exercise reasonable care regarding the hiring, training, and supervision of these employees, particularly given the risks, known to Defendants, of human trafficking occurring at these hotels.

92. Defendants, through their agents and employees, had an opportunity to and did observe obvious signs of sex trafficking at the Studio 6 and yet allowed it to continue unabated and facilitated and supported it.

93. Defendants, through their agents and employees, had an opportunity to and did observe obvious signs that Jane Doe was being trafficked at the Studio 6 and yet allowed it to continue unabated and facilitated and supported it.

94. Defendants facilitated sex trafficking of Jane Doe through their failure to adopt, implement, and enforce reasonable and adequate anti-sex trafficking policies and training despite their knowledge of the actual and ongoing problem of sex trafficking at hotel properties, including Studio 6.

95. The most effective weapon against sexual exploitation and human trafficking is education and training.[48] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property. [49]

96. This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry.[50]

97. In reference to companies like G6 Hospitality ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

98. If G6 Hospitality had adequately trained and implemented guidelines, "red flags," training policies and procedures, and other recommendations adopted in the industry, G6 Hospitality would have known of Jane Doe's trafficking at Studio 6, and would have been in a position to prevent the trafficking of Jane Doe.

---

[48] Polaris Project, It's Not Knowing the Signs – It's Knowing the Story, POLARIS, https://polarisproject.org/recognizing-human-trafficking/.

[49] Sex Trafficking in the Tourism Industry, J. Tourism Hospit. 2015, link at https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pd.

[50] Brian O'Connell, Hotels Tackle Human Trafficking: Managers Train Hotel Staff to Spot Warning Signs, INSURANCE NEWS, Mar. 18, 2020, https://www.shrm.org/topics-tools/news/employee-relations/hotels-tackle-human-trafficking

99. Despite the obvious signs of sex trafficking at the Studio 6, Jane Doe's trafficker was allowed to continue to use Studio 6 as the venues for Jane Doe's violent sexual exploitation and trafficking. Adequate training would have prevented Jane Doe's trafficking.

100. There was also heavy foot traffic in and out of Jane Doe's room involving men who were not hotel guests. Jane Doe had no less than 8 men a day sexually exploiting her at Studio 6. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are sign of sex trafficking. Had Defendant G6 Hospitality enforced the policies and procedures they enacted to prevent trafficking from occurring within their Studio 6 branded hotels after observing an obvious sign of trafficking as described above, Jane Doe's trafficking would have been identified and reported, which would have prevented her trafficking at Motel 6.

**G6 Hospitality Had Actual Knowledge of the Sex Trafficking Venture**

101. Based upon public reporting, investigations, criminal incidents, hotel reviews and comments, G6 Hospitality had actual knowledge of pervasive and continuous sex trafficking throughout the Hotel Industry, its franchised and owned hotel properties (including Studio 6), and knowingly chose to facilitate sex trafficking at its locations, including Studio 6, and benefited from its participation in a sex trafficking venture. G6 Hospitality's knowledge went well beyond its general awareness of sex trafficking in the hospitality industry, but actual knowledge of the sex trafficking venture carried on at Studio 6.

102. Studio 6 staff, the "boots on the ground," observed the signs of sex trafficking present before, during, and after Jane Doe's trafficking at Studio 6. These employees were purportedly required to relay their knowledge of Jane Doe's sex trafficking to G6

Hospitality. Thus, all Defendants knew or should have known about Jane Doe's sex trafficking.

103. Moreover, the knowledge of the Studio 6 staff, including its management-level employees, is imputed to Defendants as corporate knowledge and therefore, all Defendants knew or should have known that Jane Doe was being trafficked in the Studio 6 hotel.

**G6 Hospitality, as Franchisor, Set Standards for Franchisee**

104. Franchisee, Dynasty Hotel Group LP, was and are at all material times required to comply with franchise agreement standards, policies, and rules, including those related to security, kidnapping, the trafficking of persons and/or compelled prostitution, if any, promulgated by G6 Hospitality.

105. In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and website. Thus, booking and room reservations are controlled by G6 Hospitality.[51]

106. The franchisor controlled the time, manner, and method of the franchisee's day-to-day operations

107. G6 Hospitality required Dynasty Hotel Group LP to adhere to consistent standard regarding the day-to-day operations of their respective hotels and exercised control over the means, methods, and tools used by Dynasty Hotel Group LP.

[51] Ellen Meyer, The Origins and Growth of Franchising in the Hotel Industry, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

108. G6 Hospitality exercises control over its franchisee, Dynasty Hotel Group LP, to ensure quality control by conducting annual on-site inspections to confirm its policies and procedures are complied with.

109. G6 Hospitality exercises control over decisions related to payment options for rooms, including but not limited to allowing payment by cash or pre-paid credit card.

110. Upon information and belief, G6 Hospitality exercises an ongoing right of control over its hotels, including but not limited to Dynasty Hotel Group LP, through the following actions:

a. hosting online bookings on G6 Hospitality's domain;
b. requiring G6 Hospitality branded hotels to use G6 Hospitality's customer rewards program;
c. setting employee wages;
d. advertising employment positions at its franchised hotels;
e. sharing profits;
f. standardized training methods for employees;
g. building and maintaining the facility in a specified manner;
h. standardized or strict rules of operation;
i. regular inspection of the facility and operation;
j. fixing prices;
k. security policies and procedures;
l. interior and exterior design decisions; and
m. other actions that deprive Studio 6 branded hotels of independence in their business operations.

111. Dynasty Hotel Group LP was an actual agent of G6 Hospitality with respect to the operation of their respective hotels.

112. G6 Hospitality retained control over the details and methods of aspects of the operation of the Studio 6 hotel that are directly relevant to the proliferation of sex trafficking at that property. As a result of this retained control and its direct involvement, G6 Hospitality participated in a venture with sex traffickers who were using the G6 Hospitality as a venue for their trafficking. Moreover, as a result of this retained control, G6 Hospitality had both the opportunity and the duty to prevent Jane Doe's trafficking.

113. G6 Hospitality retained control over the training of the staff of Studio 6 regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If G6 Hospitality had exercised reasonable diligence in providing training, G6 Hospitality would have prevented the Studio 6 from being used to facilitate obvious and apparent sex trafficking, including the trafficking of Jane Doe. By failing to take reasonable steps to provide appropriate training, despite the overwhelming evidence it had of an ongoing problem with use of its branded properties for sex trafficking, G6 was negligently facilitating sex trafficking.

**Defendants Knowingly Benefitted from Jane Doe's Sex Trafficking**

114. Defendants knowingly received substantial financial benefit from Jane Doe's traffickers, including but not limited to revenue generated from room rental and other ancillary expenses at the Studio 6. Thus, Defendants, benefited directly from providing support to Jane Doe's traffickers, who Defendants knew or should have known were engaged in illegal sex trafficking.

115. Franchisee intentionally or knowingly benefited through increased revenue from rooms rented to Jane Doe traffickers.

116. G6 Hospitality intentionally or knowingly benefited from participating in a venture that traffics another person by, among other things, receiving financial benefits from the trafficking venture at their corporate headquarters in Carrolton, Texas. For every room rented, a percentage is sent by G6's operating company (for G6 owned properties) or the franchisee (for franchised properties) to Defendants at their corporate headquarters in Carrollton, Texas.

117. G6 Hospitality directly participated in renting rooms from and through the actions of its corporate headquarters. In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, Franchisor requires Franchisee to utilize its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website. Thus, booking and room reservations are controlled by G6 Hospitality.[52]

118. Franchisee and G6 Hospitality participated in renting rooms through the acts of the staff of Studio 6 who are joint employees of Franchisee and G6 Hospitality because Franchisee and G6 Hospitality jointly exercise control over the terms and conditions of their employment.

119. As a result of the monies paid by Jane Doe's traffickers to the secure rooms for her trafficking at Studio 6, all Defendants knowingly benefitted from participating in the venture that trafficked, harbored, and maintained Jane Doe's trafficking at Studio 6.

---

[52] *Id*.

120. Defendant Eric R. Hird is named as a beneficiary of the trust that holds ownership of the hotel property where the events giving rise to this Complaint occurred. As a beneficiary, Hird profited from the operation of the hotel while maintaining an interest in the financial success of the property.

121. Upon information and belief, Hird knew or should have known that the hotel was being used as a site for illicit activities, including sex trafficking, and failed to take reasonable steps to prevent or halt such conduct despite having the authority and financial interest to do so.

122. The hotel's ongoing facilitation of trafficking was a direct result of policies and practices that prioritized financial gain over guest safety, and as a beneficiary, Hird derived profits from these operations.

123. Hird's failure to act despite clear indicators of trafficking, such as high foot traffic to specific rooms, constant visits and stays by unregistered guests, and frequent visits by johns among other signs, constitutes willful blindness and/or negligent oversight, contributing to the harm suffered by the Plaintiff.

124. As a direct and proximate result of the Defendants' actions and inactions, including Hird's financial benefit from and failure to intervene in the trafficking occurring at the hotel property. Plaintiff has suffered severe emotional, physical, and psychological harm.

## A. CAUSE OFACTION AGAINST HOTEL DEFENDANTS
### VIOLATIONOFTHE TVPRA, 18 U.S.C. §1595 (AGAINST ALLDEFENDANTS)

125. The Plaintiff adopts and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as fully set forth herein.

126. Jane Doe is a victim within the meaning of 18 U.S.C. 1595(a).

127. Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as described above, each Defendant knowingly benefitted, by receiving financial and other compensation, for their participation in a venture they knew or should have known was engaged in sex trafficking, in violation of the TVPRA, 18 U.S.C. § 1591, et seq. Defendants knew that their repeated failures to address known risks of human trafficking at their hotel properties, and to continue providing venues for sex trafficking, would increase the overall volume of illegal commercial sexual exploitation and victimization at their hotel properties. Defendants further knew or should have known that their acts and omissions were advancing the trafficker's sale and victimization of Jane Doe for commercial exploitation at Studio 6.

128. Each and every one of Defendants knowingly received the following benefits as the result of a participating in a venture that Defendants knew or should have known was engaged in sex trafficking:

a. Profit from renting rooms to those looking to sexually exploit Jane Doe and other human trafficking victims;

b. Increased profit margins due to lower operation cost by refusing to implement proper training of the Hotel Defendants' employees and managers regarding the signs of human trafficking and the exploitation of victims;

c. Increased profit margins due to lower operation cost by refusing to hire qualified security officers who would actively combat human trafficking and the exploitation of victims;

d. Increased profit margins as a result of continued customer loyalty by traffickers and johns who sought to exploit victims, including Jane Doe,due to Hotel Defendants' lack of measures against the exploitation of victims and human trafficking. This customer loyalty led to continued alcohol, food, and room sales;

e. Increased profit margins as a result of presenting a more "marketable brand" to traffickers and johns looking to exploit victims–which in turn leads to higher alcohol, food, and room sales when these traffickers and johns visit Hotel Defendants' property; and

f. Increased profit margins by knowingly catering to the needs of a criminal subculture that is looking for locations that will not actively enforce laws against human trafficking and the exploitation of victims or take active security measures to prevent human trafficking and the exploitation of victims on their property.

g. Other direct and indirect benefits of both a financial and non-financial nature to be proven at trial.

129. Each and every Defendant was a beneficiary of and participated in a venture with, among others, Jane Doe's traffickers. Defendants had an association in fact with Jane Doe's traffickers. Despite the fact that Defendants knew or should have known that he was engaged in sex trafficking in violation of the TVPRA, Jane Doe's trafficker was able to continue renting rooms for the exploitation of Jane Doe. Traffickers, including the trafficker of Jane Doe, frequently used the Studio 6 hotel because they knew that staff members looked the other way despite obvious signs of trafficking and that Defendants failed to adopt and implement policies to detect and stop trafficking. Thus, there was an implicit agreement between the traffickers and Defendants and their employees and agents,

including the staff of Studio 6. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits.

130. Each Defendant profited while Jane Doe's trafficker was able to rent a secure venue to earn profits by trafficking Jane Doe. Each Defendant took affirmative actions in furtherance of the venture by continually renting rooms to sex traffickers including but not limited to Jane Doe's trafficker, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of Jane Doe's trafficking.

131. Even though they knew or should have known about the exploitation occurring on their properties, Defendants kept receiving benefits from the rental of rooms to traffickers. As a result of Defendants' choice to receive such benefits, many victims, including Jane Doe, were trafficked and exploited on the properties of the Defendants. This provided a venue for trafficking and constitutes participation by Defendants in a venture under the TVPRA.

132. Defendants committed each of these violations directly, through their own acts and omissions, and through the acts and omissions of their agents, including the staff of the Studio 6.

133. Defendants conduct is jointly and severally liable for the entire amount of damages awarded by a jury in this case under TVPRA.

## VIOLATION OF THE TEX. CIV. PRAC. & REM. CODE ANN. § 98.002
## (AGAINST ALLDEFENDANTS)

134. The Plaintiff adopts and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as fully set forth herein.

135. At all relevant times, the Plaintiff is a victim of trafficking within the meaning of Tex. Civ. Prac. & Rem. Code Ann. § 98.001 and Tex. Penal Code Ann. § 20A.02(3).

136. At all relevant times, Defendants engaged in trafficking and are liable pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 98.002.

137. The Plaintiff is a survivor of sex trafficking within the meaning of Tex. Penal Code Ann. § 20A.02(3) and is entitled to bring a civil action under Tex. Civ. Prac. & Rem. Code Ann. § 98.002 against any individual or entity whose violations of the Tex. Civ. Prac. & Rem. Code Ann. § 98.002 proximately caused the Plaintiff to sustain physical and psychological injuries and other damages as a result of being trafficked at Studio 6.

138. The Defendants knowingly benefited from participating in a venture which they knew or should have known was engaged in illegal sex trafficking in violation of the Tex. Civ. Prac. & Rem. Code Ann. § 98.002, by *inter alia*, Defendants intentionally or knowingly benefitted from participating in a venture that trafficked Jane Doe, making Defendants liable to Jane Doe for damages arising from the trafficking. Defendants knew that their repeated failures to address known risks of human trafficking on their hotel properties would increase the overall volume of illegal commercial sexual exploitation and victimization at their hotel properties. Defendants knowingly benefited from facilitating the activities of traffickers who Defendants knew or should have known were involved in a violation of Tex. Civ. Prac. & Rem. Code Ann. § 98.002.

139. Defendants knowingly benefited financially from the presence of traffickers at their hotel properties by consistently renting rooms where a trafficker repeatedly sold the Plaintiff for sex at Defendants' hotel properties and accordingly, participated in the trafficking venture that exploited her by the various means described herein.

140. The Plaintiff has suffered substantial physical and psychological injuries, and other damages, as a result of being trafficked at Defendants' hotel properties.

141. Each and every one of Defendants knowingly received the following benefits as the result of a participating in a venture that Defendants knew or should have known was engaged in sex trafficking:

a. Profit from renting rooms to those looking to sexually exploit Jane Doe and other human trafficking victims;

b. Increased profit margins due to lower operation cost by refusing to implement proper training of the Hotel Defendants' employees and managers regarding the signs of human trafficking and the exploitation of victims;

c. Increased profit margins due to lower operation cost by refusing to hire qualified security officers who would actively combat human trafficking and the exploitation of victims;

d. Increased profit margins as a result of continued customer loyalty by traffickers and johns who sought to exploit victims, including Jane Doe, due to Hotel Defendants' lack of measures against the exploitation of victims and human trafficking. This customer loyalty led to continued alcohol, food, and room sales;

e. Increased profit margins as a result of presenting a more "marketable brand" to traffickers and johns looking to exploit victims–which in turn leads to higher alcohol, food, and room sales when these traffickers and johns visit Hotel Defendants' property; and

f. Increased profit margins by knowingly catering to the needs of a criminal subculture that is looking for locations that will not actively enforce laws against human trafficking and the exploitation of victims or take active security measures to prevent human trafficking and the exploitation of victims on their property.

g. Other direct and indirect benefits of both a financial and non-financial nature to be proven at trial.

142. Each Defendant was involved in a venture with Jane Doe's traffickers, having an association with them. Despite knowing or being should have known about the sex trafficking in violation of Texas law, Jane Doe's trafficker continued to rent rooms for her exploitation. Traffickers, including Jane Doe's, repeatedly used the Studio 6 because staff ignored signs of trafficking and the Defendants failed to implement policies to stop it. There was an implicit agreement between the traffickers and the Defendants, including employees and agents. All shared the goal of renting rooms and making profits. Each Defendant profited while Jane Doe's trafficker exploited her, furthering the venture by renting rooms to traffickers, failing to enforce anti-trafficking measures, and allowing the exploitation to continue with minimal risk of detection. Despite knowing or having reason to know about the trafficking occurring on their properties, Defendants continued to benefit from renting rooms to traffickers. By choosing to accept these benefits, Defendants

facilitated the trafficking and exploitation of victims, including Jane Doe, on their properties. This created a venue for trafficking and constitutes participation by Defendants in a venture under Tex. Civ. Prac. & Rem. Code Ann. § 98.002.

143. Defendants committed each of these violations directly, through their own acts and omissions, and through the acts and omissions of their agents, including the staff of Studio 6.

144. Defendants are jointly and severally liable for the entire amount of damages awarded by a jury in this case under Tex. Civ. Prac. & Rem. Code Ann. § 98.003.

**TOLLING OF LIMITATIONS**

145. To the extent Defendants assert an affirmative defense of limitations, Plaintiff alleges that the statute of limitations was tolled due to fraudulent concealment. As set out above, Defendants made affirmative misrepresentations regarding its alleged efforts to combat human trafficking when in fact they knew these representations were false and knowingly allowed trafficking to occur on their properties and knowingly benefited from the trafficking. Defendants acted with a fixed purpose to conceal the facts necessary for the Plaintiff to know she had a cause of action against them, and Plaintiff did not discover and was not in a position to discover the existence of a cause of action against Defendants until shortly before suit was filed, and certainly not more than ten years before suit was filed.

146. To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the discovery rule. At the time Plaintiff was harmed, Plaintiff did not know that she was the victim of human trafficking, that her injury arose from being trafficked at Defendant(s) hotels or that she was a person trafficked as the term is used in Tex. Civ. Prac. & Rem. Code Ann. § 98.002, much less that she was being victimized by a human

trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, and certainly not more than ten years before suit was filed. Moreover, at the time the trafficking occurred, Plaintiff did not know what "human trafficking" as the term is used in Tex. Civ. Prac. & Rem. Code Ann. § 98.002 was, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the existence of a cause of action until shortly before suit was filed, and certainly not more than five years before suit was filed.

147. In addition, to the extent Plaintiff's claim might otherwise be barred by limitations, limitations should be tolled because Plaintiff could not have reasonably discovered the cause of action, and/or was under a legal disability as described in Tex. Civ. Prac. & Rem. Code Ann. § Sec. 16.001(2) (or the analogous provision of any other potentially applicable law) within the limitations period due to psychological trauma she suffered as a result of the trafficking.

## E. CAUSES OF ACTION ALL PARTIES

### CAUSE OF ACTION—JOINT AND SEVERAL LIABILITY UNDER TEX. CIV. PRAC. & REM. CODE ANN. § 98.003

148. Defendants' conduct violated Tex. Civ. Prac. & Rem. Code Ann. § 98.002. Therefore, each of the Defendants is jointly and severally liable for the entire amount of damages awarded by a jury in this case under Tex. Civ. Prac. & Rem. Code Ann. § 98.003.

## VIII. DAMAGES

149. Plaintiff adopts and re-alleges each paragraph above as if set forth herein. Including the damages specifically alleged above, Jane Doe seeks the following damages from all Defendants.

**A. Damages for Violation of TVPRA, 18 U.S.C. § 1591 and Tex. Civ. Prac. & Rem. Code Ann. § 98.002 Against Defendants.**

150. Plaintiff prays for all damages as allowed under federal law and Texas law including the Texas Civil Practice & Remedies Code including, but not limited to:

i. actual damages;

ii. mental anguish;

iii. court cost;

iv. reasonable attorney's fees; and

v. exemplary damages

b. Plaintiff seeks the award of exemplary damages against Defendants as recoverable under Texas law and federal law.

c. Plaintiff also requests that the Court award pre-judgment and post-judgment interest in accordance with the prevailing rates of interest under Texas law and federal law.

151. **Exemplary Damages Unrestricted for all Defendants for Violations Under Tex. Civ. Prac. & Rem. Code Ann. § 98.003.**

a. Defendants' acts, omissions, and/or commissions outlined above constitute a knowing violation of Tex. Penal Code Ann. § 20A.02 and Tex. Civ. Prac. & Rem. Code Ann. § 98.002. Therefore, under Tex. Civ. Prac. & Rem. Code Ann. § 98.003 exemplary damages are proper and unlimited.

## IX. JURY DEMAND

In accordance with Tex. R. Civ. P. 504.1, Plaintiff hereby makes application for a jury trial and request that this cause be set on the Court's Jury Docket. In support of her application, the

appropriate jury fee has been paid to the Clerk at least thirty-days (30) in advance of the trial setting.

## X. PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendants jointly and severally, for the actual, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Plaintiff may, in law or in equity, show herself to be justly entitled.

Dated: March 28, 2025 Respectfully submitted,

/s/ F. Bady Sassin

State Bar No.: 00788357
SASSIN LAW FIRM, P.C.
5220 Spring Valley Road, Suite 618
Dallas, Texas 75254
214-999-1999
214-353-7101 - Fax
sassinlawfirm@gmail.com
***ATTORNEY FOR PLAINTIFF***

**ALSO APPEARING PENDING PRO HAC VICE ADMISSION:**

Krisel McSweeney
Florida Bar No.: 112637
McSweeney Law Firm
5550 Glades Rd., Suite 500
Boca Raton, FL 33431
Tel.: 800-540-0668
Fax: 561.961.5191
Kmcsweeney@mcsweeneylawfirm.com